Ira **NASH**, Jr., Appellant,

v.

The **STATE** of Texas, Appellee.

No. 44421.

Court of Criminal Appeals of Texas.

Jan. 11, 1972.

Rehearing Denied March 1, 1972.

Kenneth R. Barron, Mike Hatchell, Tyler, for appellant.

Curtis L. Owen, Dist. Atty., and John E. Trube, Asst. Dist. Atty., Tyler, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for murder where the punishment was assessed by the jury at 100 years.

On February 20, 1969, at approximately 4:30 p. m., Henry Moore was found shot to death in his taxi cab on 33rd Street, a lonely unimproved road just outside the city limits of Tyler. His watch and money were missing. The State relied principally for conviction upon the testimony of one witness who placed the appellant in the taxi cab a short time before Moore's body was discovered and appellant's extrajudicial confessions of June 2 and June 3, 1969.

All of appellant's grounds of error relate to these extrajudicial confessions. Appellant contends that his pre-interrogation request for counsel on June 2 affirmatively secured his right thereto and rendered his subsequent statements inadmissible as a matter of law. He urges that under these circumstances waiver was impossible. The theory is also advanced that if waiver was permissible, then the evidence does not reflect a voluntary and intelligent waiver of counsel nor show that the State established "beyond a reasonable doubt" that the confessions were voluntary. Appellant further contends that without the confessions the evidence was insufficient to sustain the conviction.

The record reflects that sometime in March, 1969, the appellant was taken into custody by Smith County officers and taken before a magistrate and then questioned about the murder. He agreed to take a lie detector test, was advised of his rights, and after the test was released. On May 26, 1969, he was arrested by virtue of an arrest warrant for the offense charged and was taken before a Justice of the Peace and warned as required by Article 15.17, Vernon's Ann.C.C.P. and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694. The appellant signed the written "warning by magistrate" acknowledging he had been so warned. Appellant was then placed in jail.

At approximately 11 or 11:30 p. m. on May 30, 1969, appellant was interrogated by Deputy Sheriff Carlson and in the early morning hours of May 31 they went to appellant's home for a watch taken in the robbery-murder but did not find it under the house where appellant stated he had hidden it. The interrogation continued, first by Carlson, then by Chief Deputy Massey and later by Deputy Lyons, and appellant was returned to his cell for breakfast. Sometime later, it not being clear from the record, but apparently on June 1, 1969, the appellant was taken from the jail in company with Deputy Massey and others. While in the vicinity of the alleged crime appellant orally stated he had committed the alleged offense.

On the morning of June 2, 1969, the appellant was taken to the district attorney's office where he was warned by Assistant District Attorney F. R. Files, Jr. in accordance with Article 38.22, V.A.C.C.P., and Miranda v. Arizona, supra. Files then determined that the appellant understood the warnings and wanted to talk to him. It was at this point that Files brought forth a written waiver form. While the prosecutor was explaining the form, reiterating the warnings already given which were also printed on the instrument, the appellant indicated he desired to have a lawyer appointed. Files then stated that " . . .

we are going to have to stop right now." The appellant immediately stated "I kinda want to talk about it. Kinda get it straight." Files replied that " . . . if you want a lawyer well I am going to have to quit talking, I can't talk to you. Now it is your life." Thereafter the appellant stated he would talk and did not want a lawyer at that time. The taped recording of the conversation introduced into evidence before the court then reflects:

"FILES: You are absolutely certain of that?

"NASH (Appellant): Yes, sir."

Thereafter appellant signed and dated a separate written waiver of his rights which included the statement "I do not want to have a lawyer present at this time." The written waiver, which also contained the "officer's warning" was witnessed by Files and Deputy Sheriff Noble. Appellant then gave and signed a written confession detailing the offense and his flight from the scene. At the conclusion of the instrument is found the following:

"Before I made this statement, I told Mr. Files that I understood that I didn't have to tell him anything and that what I did say could be used in court against me. I told him I did not want to have a lawyer present at the time I made the statement."

The next day, June 3, the appellant was taken to the sheriff's office where he was again warned of his rights by Files and indicated he desired to waive his constitutional rights and executed another separate written waiver. Thereafter he gave another written statement giving other details of the offense. Such statement contained the same provisions as to waiver as did the statement of June 2.

Testifying at the hearing on the motion to suppress the appellant, apparently in his early twenties, related that after his arrest on May 26, he was placed in a windowless 7' x 11' "hole" in the county jail with steel bunk, toilet, and a bright light and that his food was pushed "through a hole" to him; that on May 30 Deputy Carlson, who weighed 290 pounds, commenced to interrogate him, called him a liar and other names, shoved or pushed him down on the floor, took him to his house to look for a watch which was not found; that thereafter he was continually interrogated by Carlson and others; that, on June 1 he orally admitted the crime while in the vicinity where it occurred; that on June 2 he had asked for an appointed attorney while talking to Files. He stated that his statements to Carlson about the watch, his oral statement and everything in his written confessions were "lies" which he had "made up." [1]

Appellant admitted he did not complain or tell anyone about Carlson's acts until he talked to his sister in September, 1969. And he acknowledged he had been convicted of burglary in 1963 in Dallas County receiving a five year probated sentence, and that in that case he had given a confession to a prosecuting attorney.

Other defense evidence showed that the appellant had a low IQ and was easily persuaded, although he was legally sane. He was shown to have suffered from muscular dystrophy or polio and to have fallen out of a tree when he was 8 years old and rendered unconscious.

Deputy Carlson testified he took the appellant from his cell only after he indicated his willingness to talk about the case. He denied any assault, threats or any type of abuse or coercion. Chief Deputy Massey testified there were no "holes" in the Smith County jail but that appellant was in an individual cell which was frequently requested by inmates for "physical and other reasons"; that such cells were far more

---

1. Appellant testified he "made up" the statements because he was afraid. When asked what he was afraid of he answered

"I was afraid if I didn't tell the truth, something might happen to me."

desirable than the other cells in the jail. He related that when he reported for work after the Carlson interrogation appellant made no complaint to him and he saw no marks, bruises, etc. on the appellant. He stated he did not abuse or mistreat the appellant. Files testified he made no promises to the appellant or used threats or coercion. Appellant himself corroborated Files' testimony. Files related that after appellant stated his desire for an attorney he apparently changed his mind and "he went ahead and visited with me at that time." Files denied he used any tricks, etc. to get the appellant to change his mind.

At the conclusion of the pre-trial hearing on the motion to suppress the trial court found the waivers to have been affirmatively made and the confessions to have been given voluntarily and then commendably filed exhaustive findings of fact and conclusions of law in support thereof. See Article 38.22, V.A.C.C.P. The court found that the appellant did in fact state on June 2 he would like for an attorney to be appointed to represent him and that any "evidence seeking interrogation" ceased and did not commence again until the appellant indicated he wished to waive his constitutional rights and executed a written waiver of such rights.

In his findings the court noted that appellant, who left high school in his senior year, had previously been convicted of burglary in 1963 and had in that case given a written confession to an assistant district attorney. The court found that the appellant's IQ was "somewhat below normal" but having heard the taped conversation of June 2 and having heard the appellant testify at the pre-trial hearing, and noting that the appellant in said statements "related in detail the events leading up to, during and following the killing would be well nigh impossible to memorize from suggestions of others and in so doing related incidents no one else could know except he had been there" "with no prompting and a

very few questions" by the prosecutor, concluded that the waivers were knowingly, intelligently and voluntarily made;[2] that the confessions were freely and voluntarily made without persuasion or compulsion, or threats or promises having been made.

After the evidence raised the issues at the trial on the merits the question of the voluntariness of the confessions was submitted to the jury and it was required to find beyond a reasonable doubt the confessions were freely and voluntarily given before the same could be considered by the jury.

■ It is appellant's first contention, as we understand it, that once the appellant indicated his desire for counsel there could be no further interrogation or effort to obtain waiver until such counsel had been made available for consultation.

The appellant relies upon the Miranda decision and more particularly the following language therefrom:

". . . The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. . . ." 384 U. S. at pp. 444–445, 86 S.Ct. at p. 1612.

"Once warnings have been given, the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." 384 U.S. at p. 474, 86 S.Ct. at p. 1627.

2. See Anderson v. State, 6 Md.App. 688, 253 A.2d 387 (1969).

Appellant does not contend that "after the assertion of a Miranda right no confession may ever be obtained and used as evidence," but urges that once the right to counsel is asserted all questioning must cease and "counsel must be supplied before any statement is taken." [3] It is his position that once the request for counsel is made no waiver is possible unless and until counsel, retained or appointed, is actually made available despite the suspect's change of mind, or who initiated the subsequent interrogation, the lack of cajoling, threats or trickery on the part of the law enforcement authorities to obtain waiver or other circumstances presented. He cites and relies upon United States v. Priest, 409 F.2d 491 (5th Cir. 1969); People v. Fioritto, 68 Cal.2d 714, 68 Cal.Rptr. 817, 441 P.2d 625 (1968); People v. Ireland, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969); People v. Randall, 1 Cal.3d 948, 83 Cal. Rptr. 658, 464 P.2d 114 (1970); State v. Anderson, 254 La. 1107, 229 So.2d 329 (1969); Petree v. State, 451 S.W.2d 461 (Ark.Sup.1970); Pierce v. State, 451 S. W.2d 219 (Ark.Sup.1970); People v. Paulin, 25 N.Y.2d 445, 255 N.E.2d 164, 166–167 (1969); People v. White, 275 Cal.App.2d 877, 80 Cal.Rptr. 461 (1969). See also United States v. Nielsen, 392 F.2d 849 (7th Cir. 1968); Virgin Islands v. Aquino, 378 F.2d 540 (3rd Cir. 1967); Creech v. Commonwealth, 412 'S.W.2d 245 (Ky.1967); People v. Peters, 20 Cal.App.3d 97, 97 Cal. Rptr. 440 (Cal.App.1971).

Appellant's position as to the necessity of the actual presence of counsel at the time of any waiver if 'there has been a prior consultation is not made clear.

In Elliott v. State, Tex.Cr.App., 444 S. W.2d 914, this court upheld a waiver made in counsel's absence where counsel consulted with the confined accused at the jail and then departed. In Caraway v. State, (No. 44,187), the waiver was made in counsel's absence after consultation by telephone. The waiver was approved. An affirmative waiver prior to a second interrogation was found in Hill v. State, 429 S. W.2d 481 (Tex.Cr.App.1968) where the accused was afforded an opportunity to consult counsel and did not do so. Waiver in such cases is more easily determined where the subsequent conversation or interrogation is initiated by the suspect followed by a clear cut waiver of counsel prior to the second or subsequent interrogation. See United States v. Brady, 421 F.2d 681 (2nd Cir. 1970); United States v. Grady, 423 F.2d 1091 (5th Cir. 1970) (FBI was unaware of prior request for counsel directed to state agents 12 hours earlier); Houston v. Peyton, 297 F.Supp. 717 (W.D.Va. 1969); Rivera Nunez v. State, 227 So.2d 324 (Fla.App.1969); Conway v. State, 7 Md.App. 400, 256 A.2d 178 (1969); State v. Oliva, 183 Neb. 620, 163 N.W.2d 112 (1968); State v. Woods, 182 Neb. 668, 156 N.W.2d 786 (1968); State v. Whitewater, 251 Or. 304, 445 P.2d 594 (1968); Wright v. State, 46 Wis.2d 75, 175 N.W.2d 646 (1970); Sharlow v. State, 47 Wis.2d 259, 177 N.W.2d 88 (1970).

In referring to the quoted portion of the Miranda decision relied upon by the appellant this court in Hill v. State, supra, stated:

"We do not interpret that portion of Miranda to mean that under no circumstances can there ever be any further interrogation, particularly where the prosecution has sustained its heavy burden of demonstrating that the accused knowingly and intelligently waived his privilege

---

3. Appellant recognizes that Miranda permits waiver of counsel and right to silence by an accused after he has been properly warned, and does not cite or mention or take issue with those cases which hold that even though the defendant has appointed or retained counsel, he can still consent to be questioned in absence of

counsel. Gunter v. State, 421 S.W.2d 657 (Tex.Cr.App.1967); Reid v. State, 478 P.2d 988 (Okla.Cr.1970); Moore v. State, 436 P.2d 236 (Okla.Cr.App.1968); State v. Adams, 76 Wash.2d 650, 458 P.2d 558 (Wash.1969); Dillon v. United States, 391 F.2d 433 (10th Cir. 1968).

against self incrimination and his right to retained and appointed counsel. Only recently this Court in Gunter v. State, 421 S.W.2d 657, held admissible, under the circumstances there presented, a confession taken in absence of and without notification of accused's court appointed counsel, in view of the clear cut affirmative waiver."

We adhere to such holding noting that immediately after the language in Miranda relied upon by the appellant the United States Supreme Court disclaimed that such language would necessitate a "station house lawyer" and then stated: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel . . . ." 384 U.S. at p. 475, 86 S.Ct. at 1628.

In United States v. Green, 433 F.2d 946 (5th Cir. 1970), it was stated:

"Miranda did not hold that, once an accused expresses a desire to have counsel present, the door to present or future interrogation is forever closed. The right to have counsel present can be waived. We are convinced that the government met its heavy burden of showing that Green knowingly and intelligently waived his right to counsel, Id. [384 U.S.] at 475, 86 S.Ct. 1602." Accord: United States v. Hatchel, 329 F. Supp. 113 (D.Mass.1971); Thompson v. State, 267 N.E.2d 49 (Ind.1971); Reid v. State, 478 P.2d 988 (Okla.Cr.1971); People v. Williams, 264 N.E.2d 901 (Ill. App.1970); State v. Jones, 278 N.C. 88, 178 S.E.2d 820 (1971); United States v. Jackson, 436 F.2d 39 (9th Cir. 1970).

United States v. Hopkins, 433 F.2d 1041 (5th Cir. 1970) and Reid v. State, supra, present fact situations similar to the instant case. In Reid the evidence reflected that before he gave his statement Reid, after being warned, indicated he wished to see his attorney, that he was told that this was up to him, and he then said he did not have anything to hide and that he might as well make a statement. The Oklahoma court held the circumstances sufficiently established that Reid waived his right to have an attorney present when he gave a statement. In Hopkins, Agent Hanley attempted to terminate the interrogation when Hopkins refused to sign the waiver form, but it was Hopkins who initiated the subsequent conversation. Waiver was held to have been shown. Cf. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; Land v. Commonwealth, 211 Va. 223, 176 S.E.2d 586 (1970); Hamilton v. Commonwealth, 401 S.W.2d 80 (Ky.1966).

We are not unaware of the holding of one panel of the 5th Circuit Court of Appeals in United States v. Priest, supra, relied upon by appellant to the effect that:

"Where there is a request for an attorney prior to any questioning, as in this case, a finding of knowing and intelligent waiver of the right to an attorney is impossible. As the quoted passages from the [Miranda] decision suggest, the suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise. . . ."

While the facts in the various cases from the 5th Circuit Court of Appeals cited may serve as a basis for reconciling the differences in the holdings of that court,[4]

---

4. In United States v. Green, supra, the defendant on September 2, 1969, had requested counsel and the interview terminated. He consulted with counsel. Thereafter on October 14, 1969, another agent, without knowledge of the previous interview or retention of counsel, gave warnings, obtained waiver and an inculpatory statement. In United States v. Priest, supra, the request for an attorney was ignored, the interrogation continued and a confession secured. See also United States v. Hopkins, supra; United States v. Grady, supra.

there is nevertheless a seemingly inconsistency in the decisions. With all due respect, we decline to follow the decision in Priest. See Pruett v. State, Tex.Cr.App., 463 S.W.2d 191.

By our decision today we do not mean to imply that once an accused, subjected to custodial interrogation, has requested counsel or indicated a desire to consult counsel, the law enforcement authorities may continue to interrogate despite the expressed wish. Nor may they threaten, trick or cajole an accused into a waiver of his constitutional rights in order to be able to continue the interrogation. What we do hold is that the request or express desire for counsel will not forever bar the State from interrogating the accused where there has been no consultation with counsel regardless of the circumstances. Waiver is possible if the prosecution meets its heavy burden in this regard.[5]

■ Having determined that waiver is permissible, we turn to appellant's contention that the waiver or waivers were not knowingly and voluntarily made. He primarily relies upon evidence of his "mental and intellectual handicap," his intelligence quotient of 76, intelligence-emotional level of a 12 year old, a marked tendency to be highly suggestible, easily persuaded and gullible.

In Grayson v. State, 438 S.W.2d 553 (Tex.Cr.App.1969), this court held that whether a defendant had the mental competency or intelligence required to waive his right to remain silent and to have counsel present prior to the giving of a confession was for the court and the jury, and the testimony of psychiatrist and psychologist concerning defendant's IQ, was not conclusive and did not require finding that the State failed to demonstrate intelligent waiver of self-incrimination privilege and right to retained or appointed counsel. Such testimony showed Grayson had an intelligence quotient (IQ) of 51 and was classified as a low grade moron.

In Casias v. State, 452 S.W.2d 483 (Tex.Cr.App.1970), this court said:

"As in Grayson v. State, Tex.Cr.App., 438 S.W.2d 553, it is difficult to see how one accused of a crime may not have sufficient intelligence or mental ability to understand the content of his confession and yet be competent to stand trial, understand the nature of the charge against him and to assist his counsel in preparing a rational defense."

In the instant case there is no claim that the appellant was not competent to stand trial, and no claim he was incompetent to testify as a witness. The court having heard the appellant, in his early twenties, who had attended high school, testify, concluded that the waivers were knowingly and intelligently made. One cannot read the testimony of the appellant, who had had previous experience with law enforcement officers and the giving of confessions, without finding ample support for the trial court's conclusion.

Nevertheless, appellant contends that when all the circumstances surrounding the interrogations of June 2 and 3 are considered, particularly the previous interrogations, the confinement in jail, etc., there was no showing of an affirmative waiver. From a totality of the circumstances, we do not agree. McCandless v. State, Tex. Cr.App., 425 S.W.2d 636; Easley v. State, Tex.Cr.App., 448 S.W.2d 490; Thomas v. State, Tex.Cr.App., 458 S.W.2d 817.

For all the reasons discussed above and in light of the record before us, we reject appellant's claims that the State failed to

---

5. Several courts, including this one, have approved second attempts to question but sometimes with the caveat that successive attempts to interview after an initial refusal will be viewed with caution. Gunter v. State, 421 S.W.2d 657 (Tex.Cr.App. 1967); Jennings v. United States, 391 F.2d 512 (5th Cir. 1968); State v. Godfrey, 182 Neb. 451, 155 N.W.2d 438 (1968); State v. Bishop, 272 N.C. 283, 158 S.E.2d 511 (1968); State v. Emmett, 463 P.2d 609 (Wash.1970); People v. Duran, 269 Cal.App.2d 112, 74 Cal.Rptr. 459 (Cal.App.1969); Franklin v. State, 6 Md.App. 572, 252 A.2d 487 (1969); Penn v. State, Okl.Cr., 456 P.2d 606 (1969).

prove "beyond a reasonable doubt" the voluntariness of the confessions. For a discussion as to the burden of proof required in separate Jackson v. Denno hearings, see Hill v. State, Tex.Cr.App., 429 S.W.2d 481, 487–488.[6] As to burden of proof after confession admitted into evidence before jury, see Washington v. State, 388 S.W.2d 200 (Tex.Cr.App.1965). Nor can we agree that the State failed to prove the elements of the offense charged beyond a reasonable doubt in light of the admissibility of the extrajudicial confessions.

Harris v. State, Tex.Cr.App., 457 S.W.2d 903, 915–916, has been decided adversely to appellant's contention that the court erred, despite timely objection, in refusing to submit to the jury special issues as to the admissibility of the extrajudicial confessions.

Finding no reversible error, the judgment is affirmed.

6. The burden of proof used by the trial court in the instant case was "beyond a reasonable doubt" and its findings and conclusions so stated. It is thus not necessary to determine whether a lesser burden of proof would have been sufficient. See Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, wherein the Supreme Court held that determining the admissibility of a confession by a preponderance of the evidence is not inconsistent with the mandate of In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. The States were left free to adopt a higher standard. Three Justices dissented and two Justices did not participate in the decision.